**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**July 6, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

———————————————

JOSHUA SAVELKOUL,

     Plaintiff - Appellant,

v.

DANIEL DRISCOLL, in his official
capacity as Secretary of the Army,

     Defendant - Appellee.

No. 25-1386
(D.C. No. 1:23-CV-02792-GPG)
(D. Colo.)

———————————————

**ORDER AND JUDGMENT**[*]

———————————————

Before **PHILLIPS**, **McHUGH**, and **EID**, Circuit Judges.

———————————————

Joshua Savelkoul, a U.S. Army soldier, was shot in the shoulder by a sniper while serving in Iraq in 2006. He sought and received medical care. Fourteen years later, he sought a Purple Heart for his injury. At first, the Army denied his request, concluding that he had not shown that his wound was severe enough to satisfy the requirements for a Purple Heart. Savelkoul appealed that

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially help decide this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

decision to federal court, which eventually remanded to the Army to consider a new declaration by the doctor who treated Savelkoul in Iraq. The Army then changed its mind and awarded Savelkoul the Purple Heart.

But this appeal is about attorneys' fees. Having received his Purple Heart, Savelkoul now seeks attorneys' fees under the Equal Access to Justice Act (EAJA), which permits plaintiffs to recover reasonable attorneys' fees from the United States under certain circumstances. *See* 28 U.S.C. § 2412(d)(1)(A).

The district court denied Savelkoul's motion for attorneys' fees. The court doubted whether Savelkoul met that provision's "prevailing party" requirement. It also determined that the government's initial position was "substantially justified," which precluded recovery under § 2412(d)(1)(A). Savelkoul timely appealed.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. First, Savelkoul was not a "prevailing party" under § 2412(d)(1)(A) because the district court's remand was not based on any error in the Army's administrative proceedings. Second, the government's position was "substantially justified" because, though the government at first erroneously denied Savelkoul his Purple Heart, it based its reasonable position on the limited materials Savelkoul provided.

2

**BACKGROUND**

### I.    Factual Background

Joshua Savelkoul joined the Army in June 2005. In October 2006, he was serving in Iraq as an infantryman. During a resupply mission in Baiji, a sniper shot Savelkoul as he manned a machinegun from a Humvee. Savelkoul felt a searing pain near his right shoulder and fell into the center of the vehicle. SPC Luke Wayman, a combat medic in the vehicle, asked if Savelkoul had been hit. Wayman looked for blood but saw none.

After the Humvee returned to base, Wayman examined Savelkoul again. With Savelkoul's body armor removed, Wayman saw the gunshot wound. Savelkoul was bleeding from a four-inch-long blunt-trauma wound along his right shoulder near his neck. SPC Wayman reported the wound to the unit surgeon, Captain Christopher Yamamoto, as well as to the physician's assistant. Captain Yamamoto cleaned, medicated, and bandaged Savelkoul's wound.

In Savelkoul's medical-discharge summary, Captain Yamamoto recorded that Savelkoul had suffered a single gunshot wound to his right shoulder and sustained a small laceration and contusion. After treating Savelkoul's wound, Captain Yamamoto returned Savelkoul to duty and released him to the care of his platoon medic with instructions for an overnight evaluation. He also instructed Savelkoul to return the next morning for reevaluation to ensure that his bleeding was controlled and that he did not have a life-threatening hematoma.

Savelkoul served in the Army for six more years before being honorably discharged in early 2013. He then transferred to the Colorado Army National Guard, attended officer candidate school, and was commissioned as a First Lieutenant.

## II.    Procedural History

### A.    Agency Proceedings

In 2020, Savelkoul applied through the Colorado Army National Guard for a Purple Heart for his 2006 injury. Both his battalion commander and his brigadier general, the Commanding General of the Colorado Army National Guard, approved his request. Their recommendation was then forwarded to the Army's Human Resources Command (HRC) and the Army Board for Correction of Military Records (ABCMR).

The HRC denied Savelkoul's Purple Heart application. The HRC concluded that Savelkoul's application did "not meet the statutory guidance" for a Purple Heart because his injuries "were not severe enough to require additional treatment by a medical officer." App. vol. I at 108.

Savelkoul appealed the HRC's denial to the ABCMR. The record before the ABCMR consisted of (1) Savelkoul's Purple Heart application (a DD Form 149), (2) Savelkoul's statement, (3) a statement from Savelkoul's lawyer, (4) Savelkoul's July 2006 orders directing a temporary change of station to Iraq, (5) a photo of Savelkoul's bullet wound along his shoulder, (6) a casualty feeder card documenting the injury (DA Form 1158), (7) a trauma record

4

completed by Yamamoto (MEDCOM Test Form 1381), (8) Savelkoul's 2013 release-from-active-duty form (DD Form 214), (9) Savelkoul's 2020 narrative in support of his Purple Heart request, (10) a 2020 personnel action form recommending Savelkoul for a Purple Heart (DA Form 4187), and (11) the HRC's memo, which included statements by SPC Wayman and Ryan McCarthy, a solider who served in Savelkoul's platoon.

The ABCMR affirmed the HRC's denial. The ABCMR explained that the HRC concluded that Savelkoul's injury was "not severe enough to require additional treatment by a medical officer." *Id.* at 79. It then offered its own explanation:

> Army Regulation 600-8-22 provides that in order to justify award of the Purple Heart, a wound must be incurred as a result of hostile enemy action, the wound must have required treatment by a medical officer, and the treatment of the wound must be documented in the medical record. Abrasions, lacerations, bruises and contusions are listed in the regulation as examples of wounds that do not justify eligibility for award of the Purple Heart; unless of a severity requiring treatment by a medical officer.

*Id.* Finally, the ABCMR recounted its review of Savelkoul's application and his supporting evidence. *Id.* It concluded that his "lacerations and contusions" were "not severe enough to require treat[ment] by a medical officer as is required by regulation regarding the requested award." *Id.*

## B.    District Court Proceedings

Savelkoul challenged the ABCMR's decision in federal district court. He alleged that he required and received medical treatment for his wound, so he

5

satisfied the requirements for a Purple Heart. But he claimed that the ABCMR had erroneously denied his Purple Heart by imposing an additional, "fabricated" requirement: that he have received "'additional treatment' separate from his initial medical treatment from a medical officer." *Id.* at 13. Thus, he said, the ABCMR's denial of his Purple Heart was not supported by evidence, so it violated the Administrative Procedure Act's prohibition on agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Savelkoul attached to his complaint an updated, signed declaration from Captain Yamamoto, dated October 11, 2023. Yamamoto had since entered private medical practice in Georgia. In his declaration, Captain Yamamoto stated that he treated Savelkoul's gunshot wound in 2006. He said that, after treating and bandaging Savelkoul's wound, he "released PFC Savelkoul into the care of his platoon medic with instructions that [Savelkoul] receive an overnight evaluation for any worsening signs or symptoms from this wound." App. vol. I at 19. Yamamoto also said that he "ordered PFC Savelkoul to return to the aid station the following day so [Yamamoto] could personally reevaluate him to ensure that his bleeding was controlled and that he did not have an enlarging and possible life-threatening hematoma forming in his neck." *Id.* Finally, Yamamoto offered his opinion that Savelkoul's wound "entitles him to a Purple Heart." *Id.*

6

Upon seeing the new Yamamoto declaration, the government moved to remand the case to the ABCMR. It described Yamamoto's declaration as "new material evidence supporting" Savelkoul's application that the ABCMR "should be allowed to consider in the first instance." *Id.* at 28. Savelkoul opposed remand, arguing that Yamamoto's declaration wasn't new evidence because "[a]ll [it] does is authenticate" the trauma record, which the ABCMR already considered. *Id.* at 37.

At first, the district court denied the government's remand request. But the court later sua sponte reconsidered its earlier order, vacated the ABCMR's order, and remanded the case to the ABCMR so it could consider the Yamamoto declaration alongside the other evidence. *Savelkoul v. Driscol*, No 23-cv-02792, 2025 WL 3300334, at *5 (D. Colo. March 7, 2025). On remand, the ABCMR awarded Savelkoul his Purple Heart.

Savelkoul moved for attorneys' fees under the EAJA. He argued that he was a prevailing party and that the government's position when denying his Purple Heart had not been substantially justified because it erroneously required that Savelkoul show that he received "additional" medical treatment for his wound. All told, Savelkoul sought $21,989.62.

The district court denied Savelkoul's motion. *Savelkoul v. Driscol*, No. 23-CV-02792, 2025 WL 2906923, at *3 (D. Colo. Sept. 9, 2025). To start, it said that it was "not clear" that Savelkoul was a prevailing party. *Id.* at *2. Next, it said that the government's initial position to deny the Purple Heart was

based on a record that was "sparse" and sometimes "difficult to discern." *See id.* at \*2. The court also pointed out that the government sought to remand "almost immediately" after seeing Yamamoto's new declaration. *Id.* at \*3. But because Savelkoul opposed remand, the government was "[f]orced to litigate on," and "took the legally supportable position" that Yamamoto's declaration wasn't part of the administrative record, so the court couldn't consider it. *Id.* The court said that it "cannot fault" the government for its decision or positions based on the information available to it at the time, so the court ruled that the Army's actions were "reasonable and substantially justified." *Id.*

Savelkoul timely appealed.

## STANDARD OF REVIEW

We review for abuse of discretion a district court's decision about whether to award attorneys' fees and costs under the EAJA. *See Pierce v. Underwood*, 487 U.S. 552, 559 (1988). A court abuses its discretion when it rests its decision on "an error of law or a clearly erroneous finding of fact" or when the decision "manifests a clear error in judgment." *United States v. Kirby*, 161 F.4th 1208, 1213 (10th Cir. 2025) (citation omitted).

## DISCUSSION

The EAJA permits a plaintiff who files a civil suit against the government to recover attorneys' fees under certain circumstances. *See* 28 U.S.C. § 2412. As relevant here, the EAJA requires a fee award when (1) a "plaintiff is a 'prevailing party,'" (2) "the position of the United States was not

8

'substantially justified,'" and (3) "there are no special circumstances that make an award of fees unjust." *Hackett v. Barnhart*, 475 F.3d 1166, 1172 (10th Cir. 2007) (quoting 28 U.S.C. § 2412(d)(1)(A)).

Under the EAJA, Savelkoul was not a prevailing party, and the government's position was substantially justified.[1] Thus, the district court did not abuse its discretion in denying him attorneys' fees. So we affirm.

## I.    Prevailing Party

Savelkoul argues that he was a prevailing party under the EAJA. We review de novo whether someone is a prevailing party under the EAJA. *Al-Maleki v. Holder*, 558 F.3d 1200, 1204 (10th Cir. 2009).

A "prevailing party" is "one who has been awarded some relief by the court." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 603 (2001); *see Iqbal v. Holder*, 693 F.3d 1189, 1194 (10th Cir. 2012). The party must "receive at least some relief on the merits of his claim before he can be said to prevail." *Buckhannon*, 532 U.S. at 603. A party has not prevailed if he didn't secure a judgment on the merits but "nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Id.* at 600. Rather, "there must be a

---

[1] Savelkoul also argues that no special circumstances make awarding him attorneys' fees unjust under the EAJA. The government has not identified any special circumstances that would make awarding Savelkoul attorneys' fees under the EAJA unjust. We do not see any, either. So on this point, we agree with Savelkoul.

material alteration of the legal relationship of the parties." *Iqbal*, 693 F.3d at 1193 (citation modified). And that alternation must have "some judicial *imprimatur*." *Id.* (citation modified).

Savelkoul contends that he's a prevailing party both because the district court remanded *and* because the ABCMR granted him a Purple Heart after considering Yamamoto's declaration.

We disagree. We acknowledge that some agency remands give rise to prevailing-party status. *See, e.g.*, *Al-Maleki*, 558 F.3d at 1205–06. But in our cases applying the rule from *Buckhannon*, we've reached different results when an agency remand identifies some error with the initial agency decision versus when an agency remand instructs the agency to repeat its process for some other reason.

In *Al-Maleki*, for example, we held that a naturalization applicant was a prevailing party under the EAJA after the district court ordered a remand to the United States Citizenship and Immigration Services with instructions to administer the citizenship oath by a certain date. *Id.* at 1203. Though USCIS agreed that the applicant was likely to be naturalized, it hadn't timely adjudicated the applicant's naturalization petition, and didn't do so until the district court ordered it to. *Id.* at 1203–05. On appeal, we held that the petitioner was a prevailing party because the remand order "placed the weight of judicial authority behind USCIS's stipulation that [the applicant] was

10

entitled to be naturalized by imposing a *judicially enforceable* obligation on USCIS." *Id.* at 1206.

By contrast, we've held that a plaintiff is not a prevailing party when an agency acts without jurisdiction but otherwise without error. In *Iqbal v. Holder*, USCIS acted outside its jurisdiction in resolving a naturalization application. It denied the application *after* the plaintiff filed a petition under 8 U.S.C. § 1447(b) for a naturalization hearing in district court. Because that petition vested exclusive jurisdiction in the district court, the district court chose to remand to enable USCIS to adjudicate the petition again, this time with jurisdiction. 693 F.3d at 1191–92. The court thought USCIS should "determine how to best proceed." *Id.* at 1192. The court stressed that its remand order was not "intended to require the USCIS to change its earlier determination of the merits of the application." *Id.* (citation omitted). On appeal, we held that the plaintiff was not a prevailing party because the court didn't order USCIS to do anything other than "determine the merits of . . . [the] naturalization application." *Id.* at 1195. In other words, it "left the matter to the USCIS's discretion." *Id.*

In *Iqbal*, unlike in *Al-Maleki*, the district court identified no error with the agency's work on the merits. Rather, the court simply instructed the agency to consider the petition once it had jurisdiction. This distinction mirrors other circuits' caselaw, which hinge prevailing-party status in the agency-remand context on whether a remand was because of agency error. *See, e.g.*, *Ward v.*

11

*U.S. Postal Serv.*, 672 F.3d 1294, 1299 (Fed. Cir. 2012) ("[W]e have held that remands not rooted in agency error do not result in prevailing party status."); *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 840 (6th Cir. 2006) ("[O]ne does not earn 'prevailing party' status by simply obtaining a remand for further proceedings before the agency from which he appealed.").

Here, the district court's remand wasn't based on agency error. It was based on new evidence. The court thought Captain Yamamoto's declaration "provide[d] new evidence that speaks directly to the sole disputed issue in the case" and "fundamentally undermine[d] the agency's stated basis for its action by providing substantial evidence that the wound . . . was the sort of wound that could be life-threatening and required treatment by a medical officer." *Savelkoul*, 2025 WL 3300334, at *5.

Remanding to enable an agency to consider evidence previously unpresented to the agency is not relief on the merits that creates prevailing-party status. *Former Emps. of Motorola Ceramic Prods. v. United States*, 336 F.3d 1360, 1366 (Fed. Cir. 2003). What's more, the court didn't order the ABCMR to reach any particular result. It "simply instructed" the ABCMR to "determine the merits" of Savelkoul's Purple Heart application with the benefit of Yamamoto's declaration. *See Iqbal*, 693 F.3d at 1195. In other words, the district court left to the ABCMR's "discretion how best to proceed." *Id.*

Nor did the remand materially alter the legal relationship between the parties. This question is the "touchstone of the prevailing party inquiry." *CRST*

12

*Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 422 (2016) (citation omitted).[2] The remand afforded the ABCMR an opportunity to consider Savelkoul's updated application, this time with Captain Yamamoto's declaration. But it didn't guarantee Savelkoul an award of the Purple Heart. So there was no "material alteration of the legal relationship of the parties" because there was no "judicially sanctioned change in the legal relationship of the parties." *Buckhannon*, 532 U.S. at 604–05 (citation omitted).

## II.    Substantially Justified

Savelkoul also argues that he's entitled to attorneys' fees under the EAJA because the government's position was not "substantially justified." He argues that the HRC and the ABCMR adopted the wrong Purple Heart standard and ignored clear evidence. He also argues that, by defending the ABCMR's erroneous decision, the government "compounded the unreasonableness." Open. Br. at 16.

We review for abuse of discretion a district court's determination of whether the government's position was substantially justified. *Hackett*, 475 F.3d at 1172. Under the EAJA, the "position of the United States" includes *both*

---

[2] Two other circuits have expressed uncertainty about whether *CRST* changed the prevailing-party determination in certain contexts. *See Beach Blitz Co. v. City of Miami Beach*, 13 F.4th 1289, 1300–01 (11th Cir. 2021); *Winters v. Wilkie*, 898 F.3d 1377, 1381–84 (Fed. Cir. 2018). Regardless, "*CRST* did not change the requirement that a plaintiff must achieve a material alteration in the legal relationship between the parties in order to be considered a prevailing party." *Winters*, 898 F.3d at 1384. So Savelkoul isn't a prevailing party under any standard.

the government's litigation position and the agency's action (or failure to act) that gave rise to the lawsuit. *Al-Maleki*, 558 F.3d at 1206–08; 28 U.S.C. §§ 2412(d)(1)(A); 2412(d)(1)(D)(2)). The EAJA's test for substantial justification is "one of reasonableness." *Pierce*, 487 U.S. at 563–64; *see Madron v. Astrue*, 646 F.3d 1255, 1258 (10th Cir. 2011). So to be "substantially justified" for EAJA purposes, the "government's position must be justified to a degree that could satisfy a reasonable person." *Hackett*, 475 F.3d at 1172 (citation omitted). The government has the burden to show that its position was substantially justified. *Id.* Its position "can be justified even though it is not correct." *Id.* (citation omitted).

We agree with the district court that the government's overall position was substantially justified. *See Savelkoul*, 2025 WL 2906923, at *2–3. We first consider the government's position in agency proceedings, then we consider its position in the district court.

### A.    Position in Agency Proceedings

First, we're not convinced that the HRC and the ABCMR adopted and applied the wrong standard. True, when the HRC denied the Purple Heart, it said that Savelkoul's injuries weren't severe enough to require "additional treatment." App. vol. I at 108. And the word "additional" didn't appear in the Purple Heart's medical-treatment requirements. *See* Army Reg. 600-8-22 ¶ 2-8(c) (2019). Though on appeal, the ABCMR quoted the HRC's use of "additional," it also later accurately quoted the regulation and explained that, in

14

its view, Savelkoul's injuries "were not severe enough to require treat[ment] by a medical officer as is required." App. vol. I at 79. So even if the HRC misstated the standard, any error was cured on appeal to the ABCMR.

Besides, it's unclear whether the HRC's misstatement amounted to it applying the wrong standard or whether that misstatement actually affected its decision. Again, the government's position can be reasonable even if it's wrong. *See Madron*, 646 F.3d at 1257–58. And here, it's not clear that the government's position *was* wrong.

Second, neither the HRC nor the ABCMR ignored clear evidence. Both reviewed the same evidence, and both engaged with all of it. And that evidence didn't obviously support awarding the Purple Heart.

To start, the evidence establishing how Savelkoul was wounded says nothing about whether his wound *required* treatment by a medical officer. The photo doesn't do much better. To an untrained eye, the somewhat grainy photo shows what might be a bad scrape.

What's more, Captain Yamamoto's handwriting in his trauma record is mostly illegible. What is legible says, "Single GSW to (R) shoulder." App. vol. I at 97. We can also see that the "RTD" box is checked and circled, indicating that Captain Yamamoto recommended Savelkoul return to duty. *Id.* We could make only educated guesses about other portions of the trauma record.

SPC Wayman's declaration doesn't seal the deal either. Wayman said that Savelkoul was wounded and "[a]t some point" received wound dressing,

15

which was later "peeled back" for treatment. *Id.* at 109. Wound dressing alone doesn't settle whether the wound required treatment by a medical officer.

And Savelkoul's argument that SPC Wayman provided medical treatment that establishes an "independent regulatory path to a Purple Heart" fails for two reasons. Open Br. at 24–25. First, contrary to Savelkoul's assertions, SPC Wayman's declaration never states that he personally treated the wound. *See* App. vol. I at 109. And second, though the regulation provides that treatment by a "medical professional" can substitute for treatment by a medical officer in certain limited circumstances, the regulation specifically excludes combat medics from its definition of "medical professional." *See* Army Reg. 600-8-22 ¶ 2-8(c)(2)–(c)(3) (2019). Thus, even if the evidence showed that SPC Wayman treated the wound, this treatment would not provide an independent regulatory path to a Purple Heart because SPC Wayman was a combat medic rather than a medical professional.

Altogether, the evidence available to the HRC and the ABCMR—the same evidence on which they relied—did not require awarding Savelkoul a Purple Heart. In other words, the evidence submitted to the HRC and ABCMR "reasonably support[ed]" their legal conclusions. *See Gutierrez v. Sullivan*, 953 F.2d 579, 585 (10th Cir. 1992) (citation omitted). So we agree with the district court that the government's position in the agency proceedings was "substantially justified."

16

**B.    Position in Litigation**

The government's litigation position also was substantially justified. Once Savelkoul obtained and presented Captain Yamamoto's declaration, the government sought remand to the Army "for reconsideration of its denial of [Savelkoul's] Purple Heart application." App. vol. I at 29. But when Savelkoul opposed remand and the district court sided with him, the government had to continue litigating. So the government argued that Captain Yamamoto's declaration didn't matter because it wasn't part of the administrative record.

That was a reasonable position to take. After all, "review of agency action generally focuses on the administrative record in existence at the time of the agency's decision." *Zzyym v. Pompeo*, 958 F.3d 1014, 1030 (10th Cir. 2020) (citation modified). Because the Army didn't have a chance to review the declaration until after remand, the government was justified in arguing that the declaration didn't matter.

Then, in response to Savelkoul's summary-judgment motion, the government defended the ABCMR's position. It argued that Savelkoul's injury "did not *require* treatment by a medical officer" because the "contemporaneous medical records identified [it] as only a small laceration/contusion." App. vol. I at 137. According to the government, then, the Army's decision was neither arbitrary nor capricious, so it did not violate the APA.

That too was a reasonable position to take. The government defended the position that the ABCMR took based on a limited record—one that lacked a key

17

declaration that Savelkoul waited seventeen years to secure. After all, it is hardly unreasonable to defend a reasonable position.

In sum, the government's positions—both in the agency's proceedings and in litigation—were "justified to a degree that could satisfy a reasonable person." *Hackett*, 475 F.3d at 1172 (citation omitted). Thus, its overall position was "substantially justified" under the EAJA. 28 U.S.C. § 2412(d)(1)(A).

\*     \*     \*

Because Savelkoul was not a "prevailing party" and the government's position was "substantially justified," the district court did not abuse its discretion when denying Savelkoul attorneys' fees under the EAJA.

## CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Gregory A. Phillips
Circuit Judge